# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 12, 2023

Lyle W. Cayce
Clerk

No. 22-40399

Greg Abbott, *in his official capacity as Governor of the State of Texas*,

*Plaintiff—Appellant*,

*versus*

Joseph R. Biden, *in his official capacity as President of the United States*; Department of Defense; Lloyd Austin, *Secretary, U.S. Department of Defense*; Department of the Air Force; Frank Kendall, III, *in his official capacity as Secretary of the Air Force*; Department of the Army; Christine Wormuth, *in her official capacity as Secretary of the Army*,

*Defendants—Appellees*.

---

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 6:22-CV-3

---

Before Stewart, Willett, and Oldham, *Circuit Judges*.

Andrew S. Oldham, *Circuit Judge*:[*]

The President of the United States asserts the power to punish members of the Texas National Guard who have *not* been called into national

---

[*] Judge Stewart concurs only in the judgment. Judge Willett joins all but Part III.A.

service. The Constitution and laws of the United States, however, deny him that power.

At the Founding, few issues garnered more attention and debate than did the Constitution's allocation of power over the military. The Federalists and Anti-Federalists feared that a standing army would lead ineluctably to tyranny. The Founders also recognized, however, that our then-fledgling Nation needed a strong national defense. The Constitution's solution to this dilemma is embodied in its Militia Clauses. Those clauses reflect a delicate compromise that gives the States power over their respective militias—subject to the President's power to call those militias into national service when necessary.

In this case, President Biden imposed and then repealed a mandate requiring State militiamen to take the COVID-19 vaccine. And now that the President has rescinded the vaccine requirement, he wants to retain the power to punish militia members who refused to get the shots while the mandate was in effect—all without calling them into national service. We reject the President's assertion of power because it would undermine one of the most important compromises in the Constitution. If the Constitution's text, history, and tradition make anything clear, it's that the President can punish members of the Texas militia *only* after calling them into federal service.

It's also important to clarify at the outset what this case is *not* about. This is *not* a case about "military readiness." The Government repeatedly emphasizes that our national government has set military readiness standards since the Founding. That's equal parts true and irrelevant. It's of course true, for example, that Congress in 1792 adopted Baron von Steuben's "Rules of Discipline," which included a host of military instructions intended to make militias ready for national service if and when called to perform it. But it's

equally true that the States—and the States alone—retained power to implement those readiness requirements. And crucially, the States—and the States alone—retained power to punish members of their militias who fell short of those standards. Thus, while it appears common ground between the parties that the President can impose vaccine requirements as part of the national effort to ensure military readiness, only the States can punish non-federalized Guardsmen who fall short of that standard. That's especially true in this case because the Secretary of Defense conceded that COVID shots are no longer necessary to military readiness when he repealed the mandate.

I.

A.

The relationship among the National Guard, the States, and the federal military is complex. *See Perpich v. Dep't of Def.*, 496 U.S. 334 (1990). But in broad strokes, the National Guard includes two "overlapping but distinct organizations"—the National Guards of the various States and the National Guard of the United States. *Id.* at 345. All who enlist in a State's National Guard must simultaneously enlist in the National Guard of the United States, *ibid.*, which is a "reserve component[] of the armed forces," 10 U.S.C. § 10101. Although the State National Guard is funded largely by the federal government, "the Governor remains in charge of the National Guard in each [S]tate except when the Guard is called into active federal service." *Holdiness v. Stroud*, 808 F.2d 417, 421 (5th Cir. 1987); *see also, e.g.*, *Blackwell v. United States*, 321 F.2d 96, 98 (5th Cir. 1963) ("The rule is well established that a member of the National Guard who . . . has not been called into federal service is not an employee of the United States within the meaning of the Federal Tort Claims Act.").

The State of Texas, for example, trains members of the Texas National Guard (which we refer to as the "Texas militia" or "Texas

No. 22-40399

Guard") and appoints its officers. U.S. CONST. art. I, § 8, cl. 15; TEX. GOV'T CODE § 437.003(c); 32 U.S.C. §§ 501–02. The Governor also retains the authority to activate the State's Guardsmen to assist with State missions (such as responding to natural disasters, riots, terrorist attacks, &c.). *See* 38 U.S.C. § 4303(15); TEX. GOV'T CODE §§ 437.004–.005. That is why we've said "the [N]ational [G]uard is the militia, in modern-day form, that is reserved to the [S]tates by Art. I § 8, cls. 15, 16 of the Constitution." *Lipscomb v. FLRA*, 333 F.3d 611, 613 (5th Cir. 2003).[1] It's also why Texas law recognizes the Governor as "Commander-in-Chief of the military forces of the State." TEX. CONST. art. IV, § 7; *see also* TEX. GOV'T CODE § 437.001(14).

The President of the United States is Commander in Chief of the United States Armed Forces at all times. He's Commander in Chief of the National Guard of the United States at all times. But he's Commander in Chief of the *State* Guards only at *limited* times. Specifically, the President becomes "Commander in Chief . . . of the Militia of the several States, *when called into the actual Service of the United States*." U.S. CONST. art. II, § 2, cl. 1 (emphasis added); *see also* TEX. CONST. art. IV, § 7 ("[The Governor] shall be Commander-in-Chief of the military forces of the State, *except when*

---

[1] The Texas "State militia" also includes the "reserve militia," which is comprised of "persons liable to serve, but not serving, in the state military forces." TEX. GOV'T CODE § 431.001(1); *see also id.* § 431.001(3) ("'State military forces' means the Texas National Guard, the Texas State Guard, and any other active militia or military force organized under state law."). The "State militia" likewise includes the Texas State Guard—"the volunteer military forces that provide community service and emergency response activities for th[e] [S]tate." *Id.* § 437.001(16); *see also id.* § 437.001(14); 32 U.S.C. § 109(c) (authorizing States to "organize and maintain defense forces" to be "used within the jurisdiction concerned"). The Texas State Guard is not part of the Texas National Guard and is not federally funded. Nor may it be "called, ordered, or drafted into the armed forces." 32 U.S.C. § 109(c). The Government's COVID-19 vaccine mandate does not apply to either the reserve militia or the Texas State Guard.

No. 22-40399

*they are called into actual service of the United States.*" (emphasis added)). The Constitution in turn assigns Congress the power "[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. CONST. art. I, § 8, cl. 15. And when the President calls the State Guards into the service of the United States—colloquially termed "federalizing"—those Guardsmen temporarily become part of the Army and Air Force. *See* 10 U.S.C. §§ 10106, 10112.

B.

On August 24, 2021, the Secretary of Defense ordered all members of the military to take COVID vaccines. "[W]ith the support of the President," Secretary of Defense Lloyd Austin "direct[ed] the Secretaries of the Military Departments to immediately begin full vaccination of all members of the Armed Forces under DoD authority on active duty or in the Ready Reserve, *including the National Guard.*" Memorandum, Secretary of Defense, Mandatory Coronavirus Disease 2019 Vaccination of Department of Defense Service Members (Aug. 24, 2021) (emphasis added). Secretary Austin explained that "[t]o defend this Nation, we need a healthy and ready force." *Ibid.*[2]

The next day, on August 25, 2021, Texas Governor Greg Abbott issued Executive Order GA-39. He commanded that "on a statewide basis

---

[2] The Constitution gives Congress the power "[t]o provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States." U.S. CONST. art. I, § 8, cl. 16. And Congress, in turn, gave the President the power to "prescribe regulations, and issue orders, necessary to organize, discipline, and govern the National Guard." 32 U.S.C. § 110; *see also* 10 U.S.C. § 10202(a) ("Subject to standards, policies, and procedures prescribed by the Secretary of Defense, the Secretary of each military department shall prescribe such regulations as the Secretary considers necessary to carry out provisions of law relating to the reserve components under the Secretary's jurisdiction."). Here, the Department of Defense is exercising that authority on behalf of the President.

No. 22-40399

. . . [n]o governmental entity can compel any individual to receive a COVID-19 vaccine." Under his power as Commander in Chief of the State's military forces, Governor Abbott later clarified that GA-39 applies to all members of Texas's militia, including the Texas National Guard.

On November 30, 2021, Secretary Austin directed the Army and Air Force to create "policies and implementation guidance to address the failure to maintain this military medical readiness requirement by members of the non-federalized National Guard who remain unvaccinated." Memorandum, Secretary of Defense, Coronavirus Disease 2019 Vaccination for Members of the National Guard and the Ready Reserve (Nov. 30, 2021). The Government eventually threatened five consequences against noncompliant Guardsmen and States (collectively, "the enforcement measures"):

(1)  Courts-martial. 32 U.S.C. §§ 326–27.

(2)  Discharge from the National Guard. *Id.* §§ 322–24.

(3)  Prohibiting Guardsmen from participating in drills, training, and other duties. *Id.* §§ 501–02.

(4)  Withholding pay from individual Guardsmen. *Id.* § 108.

(5)  Withholding funds from individual States. *Ibid.*

Governor Abbott filed suit on January 4, 2022.[3] He alleged that the military vaccine mandate is arbitrary and capricious within the meaning of the Administrative Procedure Act ("APA"). He also alleged that all but one of the Government's planned enforcement measures violate the Constitution. For relief, Governor Abbott sought an order declaring the vaccination requirement and the challenged enforcement measures unlawful,

---

[3] Alaska Governor Mike Dunleavy joined the suit. Governor Dunleavy is not a party to this appeal, however.

No. 22-40399

setting them aside, and enjoining their enforcement as to non-federalized Guardsmen. He also requested costs, attorneys' fees, and any other relief the court deems proper.

Governor Abbott then moved for an order preliminarily enjoining the defendants from enforcing the vaccine mandate against members of the Texas militia not in federal service. The district court denied the motion. The Governor appealed under 28 U.S.C. § 1292(a)(1).

After our court heard oral argument, President Biden and Congress directed Secretary Austin to rescind the COVID vaccine mandate for military service members. *See* James M. Inhofe National Defense Authorization Act for Fiscal Year 2023, Pub. L. No. 117-263, § 525, 136 Stat. 2395, 2571–72 (2022). On January 10, 2023, Secretary Austin rescinded his earlier memos. Memorandum, Secretary of Defense, Rescission of August 24, 2021, and November 30, 2021, Coronavirus Disease 2019 Vaccination Requirements for Members of the Armed Forces (Jan. 10, 2023). He left undisturbed "[o]ther standing Departmental policies, procedures, and processes regarding immunizations." *Ibid.* And he also clarified that "[n]o individuals currently serving in the Armed Forces shall be separated solely on the basis of their refusal to receive the COVID-19 vaccination if they sought an accommodation on religious, administrative, or medical grounds." *Ibid.*

## II.

"Jurisdiction is always first." *Carswell v. Camp*, 54 F.4th 307, 310 (5th Cir. 2022) (quotation omitted). Mootness is a jurisdictional question because "[t]he inability of the federal judiciary to review moot cases derives from the requirement of Art. III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy." *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974) (per curiam) (quotation omitted).

To invoke the jurisdiction of the federal courts under Article III, a plaintiff "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). That's standing. The mootness doctrine, by contrast, requires that a plaintiff's interest in a suit "exist[] throughout the proceedings." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796 (2021). That means a case becomes moot "when it is impossible for a court to grant 'any effectual relief whatever to the prevailing party.'" *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (quoting *Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)).

The Government claims this appeal is moot. That's so, it says, because Governor Abbott seeks to enjoin the Government from enforcing the vaccine mandate against Texas's militia; but after Governor Abbott filed suit, President Biden signed into law a statute that ordered Secretary Austin to rescind that very mandate. *See* § 525, 136 Stat. at 2571–72 ("Not later than 30 days after the date of the enactment of this Act, the Secretary of Defense shall rescind the mandate that members of the Armed Forces be vaccinated against COVID-19."). The Government asserts that "[b]ecause the Texas National Guard is no longer subject to the challenged requirement, Governor Abbott has obtained all the relief that he sought in this appeal."

If that were true, it would very likely moot this appeal. *See, e.g.*, *Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir. 2020) ("[A] case challenging a statute, executive order, or local ordinance usually becomes moot if the challenged law has expired or been repealed."); *Amawi v. Paxton*, 956 F.3d 816, 821–22 (5th Cir. 2020) (holding the case moot because an intervening law "provided the plaintiffs the very relief their lawsuit sought"). But it's not true. Secretary Austin did not simply rescind the vaccine mandate and all related enforcement measures. Instead, he reserved the ability to punish Guardsmen who didn't seek a religious, administrative, or medical accommodation while

the mandate was operative. *See* Memorandum, Secretary of Defense, Rescission of August 24, 2021 and November 30, 2021 Coronavirus Disease 2019 Vaccination Requirements for Members of the Armed Forces (Jan. 10, 2023); *see also* Leo Shane III, *Troops Who Refused COVID Vaccines Still Could Face Punishment*, Military Times (Feb. 28, 2023), https://www.militarytimes.com/news/coronavirus/2023/02/28/troops-who-refused-covid-vaccines-still-could-face-punishment/. According to Major General Thomas Suelzer—Adjunct General of the Texas National Guard—over 1,000 Texas Guardsmen remain unvaccinated, never sought an accommodation while the mandate was in effect, and hence remain under Secretary Austin's Damoclean sword.

As such, many Texas militiamen still face the same enforcement measures that Governor Abbott seeks to enjoin. This appeal therefore isn't moot because we can still grant "effectual relief." *Pap's A.M.*, 529 U.S. at 287 (quotation omitted); *see also Dailey v. Vought Aircraft Co.*, 141 F.3d 224, 226–29 (5th Cir. 1998); *First Nat'l Bank of Lamarque v. Smith*, 610 F.2d 1258, 1262–63 (5th Cir. 1980). We therefore have jurisdiction.

## III.

We turn to the preliminary injunction. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. "[T]he ultimate decision whether to grant or deny a preliminary injunction is reviewed only for abuse of discretion." *Speaks v. Kruse*, 445 F.3d 396, 399 (5th Cir. 2006) (quotation omitted). But "a decision grounded in erroneous legal principles is reviewed *de novo*," *ibid.*, and factual findings are

No. 22-40399

reviewed for clear error, *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 537 (5th Cir. 2013).

The only factor the district court considered is likelihood of success on the merits. Governor Abbott asserts (A) an APA challenge and (B) a constitutional one. We remand as to both so the district court can apply the correct legal standards.

A.

We first must ensure that Governor Abbott's APA claims are justiciable. *See Meister v. Tex. Adjutant Gen.'s Dep't*, 233 F.3d 332, 335 (5th Cir. 2000). The Government *could* have argued (but failed to argue) that the Governor's APA claims are non-justiciable because the APA explicitly carves out from its coverage "a military or foreign affairs function of the United States." *See* 5 U.S.C. § 553(a)(1) (rulemaking); *accord id.* § 554(a)(4) (adjudication). The APA also carves out decisions that are "committed to agency discretion by law." *Id.* § 701(a)(2).

These carveouts are forfeitable. That's because, where the carveouts apply, they deprive a would-be APA plaintiff of his cause of action; and arguments against a plaintiff's cause of action go to the forfeitable merits, not non-forfeitable jurisdiction. *See Air Courier Conf. of Am. v. Am. Postal Workers Union AFL-CIO*, 498 U.S. 517, 517 n.3 (1991); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998); *Bell v. Hood*, 327 U.S. 678, 682 (1946) ("Jurisdiction, therefore, is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction."). By invoking neither carveout, the Government forfeited both. *Hamer v. Neighborhood Hous. Servs. of Chicago*, 138 S. Ct. 13, 17 (2017)

No. 22-40399

(discussing forfeiture of non-jurisdictional defects). We therefore hold the case is justiciable.

Assured that Governor Abbott's APA claims are justiciable, we turn to the applicable standards. The APA instructs courts to "hold unlawful and set aside" agency actions that are "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A). This so-called "arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021); *see also Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021) ("We must not 'substitute' our 'own policy judgment for that of the agency.' Still, we must ensure that 'the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision.'" (quoting *Prometheus*, 141 S. Ct. at 1158)). For example, courts must set aside agency actions that lack "a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins.*, 463 U.S. 29, 43 (1983) (quotation omitted), contain "unexplained inconsistencies," *Sierra Club v. EPA*, 939 F.3d 649, 664 (5th Cir. 2019) (quotation omitted), "fail[] to account for relevant factors," *Texas v. United States*, 40 F.4th 205, 226 (5th Cir. 2022) (quotation omitted), or "evince[] a clear error of judgment," *ibid*. Arbitrary-and-capricious review is thus "not toothless," but rather has "serious bite." *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 856 (5th Cir. 2022) (quotation omitted).

True, matters of military affairs warrant judicial modesty. *See, e.g.*, *Gilligan v. Morgan*, 413 U.S. 1 (1973). But the plaintiffs in *Gilligan* requested a structural injunction—"a broad call on judicial power to assume continuing regulatory jurisdiction over the activities of the Ohio National Guard." *Id.* at 5; *see also Horne v. Flores*, 557 U.S. 433, 447–50 (2009) (describing some of the myriad problems with structural injunctions). Such structural injunctions

11

are obviously inappropriate because they transgress the Constitution's limits on the judicial power. *See Gilligan*, 413 U.S. at 8–10.

Governor Abbott's request is far more modest. He does not request a structural injunction or a nationwide one. He also does not request any relief that would inhibit the President's power over the federalized Guard. Rather, he asks only to protect the Guardsmen who are in the State's service from unlawful regulation by a President who has not federalized them. This is far afield from *Gilligan*.

The district court concluded otherwise. It briefly mentioned the APA and then cited *Gilligan* for the proposition that "[j]udgments about military readiness . . . warrant particular humility in judicial review." The court then pointed to Secretary Austin's statements regarding a "healthy" military.[4] From this, the district court concluded: "Federal officials simply balanced the policy interests differently than would Governor Abbott."

The APA requires more. As the Governor argued:

Defendants "entirely failed to consider an important aspect of the problem," *Motor Veh. Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983): Guardsmen are not a mere supplement to the federal military, but a vital part of each State's ability to secure its citizens' property, liberty, and lives—a vitality that is sapped by drumming Guardsmen out of militia service. The Defendants' failure to weigh those considerations before upending the Texas National Guard's chain of command requires that the Enforcement Memoranda be set aside.

---

[4] Specifically, Secretary Austin said: "To defend this Nation, we need a healthy and ready force," "Vaccination is essential to the health and readiness of the Force," and "Vaccination of the Force will save lives and is essential to our readiness."

ROA.248; *see also Holdiness*, 808 F.2d at 421 ("The Governor remains in charge of the National Guard in each [S]tate except when the Guard is called into active federal service."); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 497 (2010) ("[T]he separation of powers does not depend on the views of individual Presidents."); *Morrison v. Olson*, 487 U.S. 654, 704–05 (1988) (Scalia, J., dissenting) ("[W]here the issue pertains to separation of powers, and the political branches are . . . in disagreement, neither can be presumed correct.").

We remand the Governor's APA claims so the district court can consider these points more fully.

B.

Next the Constitution. Governor Abbott acknowledges that Congress can set readiness requirements for the Texas Guard. And he further recognizes that the erstwhile COVID vaccine mandate was one such requirement. But the Governor argues that the Constitution forbids the Government from stepping into his shoes and directly enforcing readiness requirements against *non-federalized* Guardsmen. We agree. Unless and until the Texas militia is federalized, Governor Abbott retains exclusive authority to punish his militiamen and otherwise govern them. That's because (1) the Constitution's text clearly says so, and (2) Founding-era history reinforces that straightforward reading of the text.

1.

"[O]ur duty [is] to interpret the Constitution in light of its text, structure, and original understanding"—as informed by history and tradition. *NLRB v. Noel Canning*, 573 U.S. 513, 574 (2014) (Scalia, J. concurring); *see also N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) (evaluating text, history, and tradition). Here, as in all of law, text is king. *See Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 338–39 (1816)

("If the text be clear and distinct, no restriction upon its plain and obvious import ought to be admitted, unless the inference be irresistible."); *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2244–45 (2022) ("Constitutional analysis must begin with 'the language of the instrument,' which offers a 'fixed standard' for ascertaining what our founding document means." (first quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 186–89 (1824); then quoting 1 Joseph Story, Commentaries on the Constitution of the United States § 399 (1833))); *Bruen*, 142 S. Ct. at 2137 ("[T]o the extent later history contradicts what the text says, the text controls.").

Here, the relevant text appears in the Constitution's two Militia Clauses. You might reasonably wonder why a case about the National Guard turns on constitutional provisions governing the militia. The answer: "[T]he [N]ational [G]uard is the militia, in modern-day form, that is reserved to the [S]tates by Art. I § 8, cls. 15, 16 of the Constitution." *Lipscomb*, 333 F.3d at 613; *accord Maryland ex rel. Levin v. United States*, 381 U.S. 41, 46, *vacated on other grounds*, 382 U.S. 159 (1965) ("The National Guard is the modern Militia reserved to the States by Art. I, § 8, cl[s]. 15, 16, of the Constitution.").

Accordingly, both the Government and Governor Abbott agree that Clauses 15 and 16 of Article I, Section 8 directly control this dispute. We refer to the first of these as the "Calling Forth Clause"; it assigns Congress the power:

> To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions[.]

U.S. Const. art. I, § 8, cl. 15. We refer to the second relevant clause as the "Organizing Clause"; it assigns Congress the power:

No. 22-40399

> To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress[.]

U.S. CONST. art. I, § 8, cl. 16;[5] *see also* 32 U.S.C. § 110.[6]

Altogether, the Calling Forth and Organizing Clauses empower Congress to provide for "*organizing*," "*arming*," and "*disciplining*" the militia at all times; Congress can also provide for "*governing*" the militia, but only when the militia is federalized. U.S. CONST. art. I, § 8, cls. 15, 16 (emphasis added). The States, by contrast, retain exclusive power to appoint

---

[5] The militia is mentioned three other times in the Constitution. *See* U.S. CONST. art. II, § 2, cl. 1 ("The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States[.]"); U.S. CONST. amend. II ("A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."); U.S. CONST. amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger[.]").

[6] The federal militia statute, 10 U.S.C. § 246, provides:

(a) The militia of the United States consists of all able-bodied males at least 17 years of age and, except as provided in section 313 of title 32, under 45 years of age who are, or who have made a declaration of intention to become, citizens of the United States and of female citizens of the United States who are members of the National Guard.

(b) The classes of the militia are—

(1) the organized militia, which consists of the National Guard and the Naval Militia; and

(2) the unorganized militia, which consists of the members of the militia who are not members of the National Guard or the Naval Militia.

officers, train militiamen, and govern the non-federalized militia; the States also share concurrent authority with Congress to provide for organizing, arming, and disciplining the militia—so long as the States' rules aren't inconsistent with Congress's.[7] Of course, Congress has the distinct constitutional power to "provide for the common Defence." U.S. CONST. art. I, § 8, cl. 1. But it cannot deploy that power in a manner that itself violates the Constitution or is otherwise coercive. *See Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 279 (5th Cir. 2005).

At the Founding, each of the above-italicized terms had a well understood meaning in the military domain. We (a) define each in the context of the Organizing Clause and then (b) analyze the Government's enforcement measures.

a.

"As always, we start with the original public meaning of the Constitution's text." *NetChoice, LLC v. Paxton*, 49 F.4th 439, 452–53 (5th Cir. 2022). When the Organizing Clause was drafted, the words (i) "organize," (ii) "arm," (iii) "discipline," and (iv) "govern" had well-understood meanings—especially in the military context.

---

[7] As the Supreme Court said long ago in *Houston v. Moore*: "[T]he powers of legislation over [the militia] are concurrent in the general and State government. . . . [A]s State militia, the power of the State governments to legislate on the same subjects, having existed prior to the formation of the constitution, and not having been prohibited by that instrument, it remains with the States, subordinate nevertheless to the paramount law of the general government, operating upon the same subject." 18 U.S. (5 Wheat.) 1, 16–17 (1820) (Washington, J.); *see also id.* at 50 (Story, J.) (noting a point of agreement with the majority) ("It is almost too plain for argument, that the power here given to Congress over the militia; is of a limited nature, and confined to the objects specified in these clauses; and that in all other respects, and for all other purposes, the militia are subject to the control and government of the State authorities."); *United States v. Emerson*, 270 F.3d 203, 249 n.57 (5th Cir. 2001); U.S. CONST. amend. X.

i.

*Organize*: At the Founding, to "organize" generally meant "To construct so as that one part co-operates with another." 2 SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE 243 (6th ed. 1785). And so in the military context, "organizing" included such things as "distribut[ing] [the whole] into suitable parts and appoint[ing] proper officers, that the whole may act as one body; as, to *organize* an army." 2 NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 214 (1828); *see also Records of the Federal Convention*, *reprinted in* 3 THE FOUNDERS' CONSTITUTION 205, 206 (Philip B. Kurland & Ralph Lerner eds., 1987) ("Mr. King, by way of explanation, said that by *organizing* the Committee meant, proportioning the officers & men."). Indeed, Congress in 1792 exercised its constitutional authority to "provide for organizing . . . the Militia" by passing a law requiring that "the militia of the respective states shall be arranged into divisions, brigades, regiments, battalions and companies." Act of May 8, 1792, ch. 33, § 3, 1 Stat. 271, 272; *cf.* 2 WEBSTER, *supra*, at 127 (defining "militia" as "the able bodied men *organized* into companies, regiments and brigades" (emphasis added)). Congress again leaned on the "organizing" power in the twentieth century when it reorganized the militia into the modern National Guard. *See Perpich*, 496 U.S. at 342; Frederick Bernays Wiener, *The Militia Clause of the Constitution*, 54 HARV. L. REV. 181 (1940).

ii.

*Arm*: "Arm" had much the same meaning at the Founding as it does today. Samuel Johnson's 1785 dictionary defined "arm" as "To furnish with armour of defence, or weapons of offence." 1 JOHNSON, *supra*, at 178; *accord* 1 WEBSTER, *supra*, at 185 ("To furnish or equip with weapons of offense, or defense; as, to *arm* the militia." (emphasis added)). Noah

Webster's post-Founding 1828 dictionary defined "arming" similarly. 1 WEBSTER, *supra*, at 186 ("Equipping with arms; providing with the means of defense or attack."). Accordingly, one might think that the Organizing Clause simply authorizes Congress to furnish weapons and other military equipment to the militia. It certainly does allow that; but because the Organizing Clause gives Congress the power to "*provide for* . . . arming," U.S. CONST. art. I, § 8, cl. 16, it also gives Congress authority to require that the militia be armed in other ways. As Rufus King explained at the Constitutional Convention, "*arming*" in this context "meant not only to provide for uniformity of arms, but included authority to regulate the modes of furnishing, either by the militia themselves, the State Governments, or the National Treasury." *Records of the Federal Convention*, *supra*, at 206. Initially, Congress required militiamen to arm and equip themselves, at their own expense.[8] Congress later appropriated "funding to support the [S]tates' National Guard, including the issue of arms, other military supplies, and other expenses." *Ass'n of Civilian Technicians, Inc. v. United States*, 603 F.3d 989, 993 (D.C. Cir. 2010); *see also* 32 U.S.C. § 106.

---

[8] "That every citizen so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with a box therein to contain not less than twenty-four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball; or with a good rifle, knapsack, shot-pouch and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder; and shall appear, so armed, accoutred and provided, when called out to exercise, or into service, except, that when called out on company days to exercise only, he may appear without a knapsack. That the commissioned officers shall severally be armed with a sword or hanger and espontoon, and that from and after five years from the passing of this act, all muskets for arming the militia as herein required, shall be of bores sufficient for balls of the eighteenth part of a pound." Act of May 8, 1792, § 1, 1 Stat. at 271–72.

No. 22-40399

iii.

*Govern*: The Organizing Clause equips Congress with the power to "provide for . . . governing" the federalized militia. U.S. Const. art. I, § 8, cl. 16. And it reserves to the States the same power with respect to the non-federalized militia. *See Holdiness*, 808 F.2d at 421 ("[T]he Governor remains in charge of the National Guard in each [S]tate except when the Guard is called into active federal service."); 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 424 (Jonathan Elliot ed., 1836) [hereinafter Elliot's Debates] (James Madison, Virginia) ("The state governments are to govern the militia when not called forth for general national purposes; and Congress is to govern such part only as may be in the actual service of the Union. Nothing can be more certain and positive than this."). Thomas Dyche and William Pardon's 1740 dictionary offers a representative definition of "govern" as "to rule over, direct, keep in awe or subjection, to manage or take care of." Thomas Dyche & William Pardon, A New General English Dictionary 358 (3d ed. 1740).[9] That's why we call the executive head of each State "Governor"—because he has the power to advance and enforce the laws. *See* 1 Webster, *supra*, at 840 (defining "governor" as "One who is invested with supreme authority to administer or enforce the laws").

---

[9] *Cf.* 1 Johnson, *supra*, at 892 (defining "To govern" as "To rule as a chief magistrate" and "To regulate; to influence; to direct"); Nathan Bailey, An Universal Etymological English Dictionary 385 (4th ed. 1763) (defining "To govern" as "to rule, manage, look to, take care of"); 1 Webster, *supra*, at 840 (defining "govern" as "To direct and control, as the actions or conduct of men, either by established laws or by arbitrary will; to regulate by authority; to keep within the limits prescribed by law or sovereign will. Thus in free states, men are *governed* by the constitution and laws; in despotic states, men are *governed* by the edicts or commands of a monarch").

No. 22-40399

Governing in the military context was understood (and still is) similarly. The Founding generation understood the "governing" power to encompass, *inter alia*, the power to command and control the troops[10] as well as to enforce the relevant laws against them.[11] They also understood the authority to enforce the law as naturally entailing the power to punish—or otherwise impose consequences upon—those subject to it.[12] "Govern" is

---

[10] *E.g.*, 3 STORY, *supra*, § 1208 ("The power to govern the militia, when in the actual service of the United States, is denied by no one to be an exclusive one. Indeed, from its very nature, it must be so construed; for the notion of distinct and independent orders from authorities wholly unconnected, would be utterly inconsistent with that unity of command and action, on which the success of all military operations must essentially depend."); *id.* § 1210 (discussing the President's authority to "govern[] and command[]" the federalized militia); U.S. CONST. art. II, § 2, cl. 1 (the President is the "*Commander in Chief*" of the Army, Navy, and federalized militia (emphasis added)).

[11] *E.g.*, *Moore*, 18 U.S. (5 Wheat.) at 9 ("The power of governing the militia, is the power of subjecting it to the rules and articles of war."); SIR MATTHEW HALE, THE HISTORY OF THE COMMON LAW OF ENGLAND 26–27 (Charles M. Gray ed., 1971) ("[F]or others who had not listed under the army had no color or reason to be bound by military constitutions applicable only to the army, whereof they were not parts, but they were to be ordered and governed according to the laws to which they were subject, though it were a time of war.").

[12] *E.g.*, Charles Pinckney, *Observations on the Plan of Government Submitted to the Federal Convention of May 28, 1787*, *reprinted in* 3 THE FOUNDERS' CONSTITUTION, *supra*, at 207, 207–08 (arguing that "[t]he exclusive right of establishing regulations for the *Government* of the Militia of the United States, ought certainly to be ves[t]ed in the Federal Councils" because it is only then that the federal government would have "coercive Power" over the militia (emphasis added)); An Act for Establishing Rules and Articles for the Government of the Armies of the United States, ch. 20, 2 Stat. 359 (1806) (listing the "articles for the *government*" of the military, including consequences and punishments for various offenses (emphasis added)); 1 WILLIAM BLACKSTONE, COMMENTARIES *414–17 (explaining the consequences the English military faced for violating the martial law "establishe[d] . . . for their *government*," including that, "if any officer and soldier shall excite, or join any mutiny, or, knowing of it, shall not give notice to the commanding officer; or shall desert, or list in any other regiment, or sleep upon his post, or leave it before he is relieved, or hold correspondence with a rebel or enemy, or strike or use violence to his superior officer, or shall disobey his lawful commands; such offender shall suffer such punishment as a court martial shall inflict, though it extend to death itself" (emphasis

---

used the same way earlier in the Constitution. Article I, Section 8, Clause 14 assigns Congress the authority "[t]o make Rules for the Government and Regulation of the land and naval Forces." And as the Supreme Court explained in *Tarble's Case*, such power includes the ability to "define what shall constitute military offences, and prescribe their punishment." 80 U.S. (13 Wall.) 397, 408 (1871).

And so, because the Constitution only grants the United States governing authority over the militia after the militia has successfully been called forth "to execute the Laws of the Union, suppress Insurrections and repel Invasions," U.S. CONST. art. I, § 8, cls. 15, 16, it follows that "the Constitution gave the federal government no power to punish the militia in peacetime," Benjamin Daus, Note, *The Militia Clauses and the Original War Powers*, 11 J. NAT'L SECURITY L. & POL'Y 489, 508 (2021); *see also, e.g.*, *Houston v. Moore*, 18 U.S. (5 Wheat.) 1, 9 (1820) ("[I]t is a principle manifestly implied in the constitution, that the militia cannot be subject to martial law, except when in actual service, in time of war, rebellion, or invasion.").

iv.

*Discipline*: Lastly, Congress can also "provide for . . . disciplining" the militia. U.S. CONST. art. I, § 8, cl. 16. Founding-era dictionaries primarily associate "discipline" with education and instruction. For example, Samuel Johnson's 1785 dictionary lists the first definition of "discipline" as "Education; instruction; the act of cultivating the mind; the act of forming the manners." 1 JOHNSON, *supra*, at 601. Other dictionaries of that era are

---

added)); *see also* Benjamin Daus, Note, *The Militia Clauses and the Original War Powers*, 11 J. NAT'L SECURITY L. & POL'Y 489, 508 (2021) ("In the Organizing Clause, . . . 'govern' refers to the power to punish.").

of a piece.[13] But those same dictionaries include other definitions associating "discipline" with punishment. Samuel Johnson's fourth listed definition of "discipline," for instance, is "A state of subjection." 1 JOHNSON, *supra*, at 602. And his sixth definition is "Punishment; chastisement; correction." *Ibid.*[14] So Congress's "disciplining" power could mean *either* the ability to provide for the militia's education and instruction *or* the authority to provide for their punishment—or both.

In context, however, it appears clear that the Organizing Clause uses "discipline" to mean instruction and not punishment. U.S. CONST. art. I, § 8, cl. 16. The end of the Organizing Clause reserves to the States "the Authority of training the Militia according to the *discipline* prescribed by Congress." *Ibid.* (emphasis added). It makes little sense to train someone "according to the [*punishments*] prescribed by Congress." *Ibid.* But it makes perfect sense to educate and teach the militia by training them "according to the [*instructions*] prescribed by Congress." *Ibid.*; *see also* Daus, *supra*, at 508–09, 509 n.131 (arguing that in the Organizing Clause, the word "'discipline' mean[s] skill or training" rather than "punishment" in large part because the "Constitution's text itself link[s] training and discipline").

Moreover, if "discipline" included punishment, it would render the "governing" power largely superfluous. U.S. CONST. art. I, § 8, cl. 16. As

---

[13] *See* DYCHE & PARDON, *supra*, at 229 ("education, instruction, teaching"); BAILEY, *supra*, at 264 ("Education, Instruction, Management, strict Order"); 1 WEBSTER, *supra*, at 579 ("To instruct or educate; to inform the mind; to prepare by instructing in correct principles and habits; as, to *discipline* youth for a profession, or for future usefulness.").

[14] *See also* DYCHE & PARDON, *supra*, at 229 ("also scourging or whipping, used by those who dwell in monasteries, by way of mortification"); BAILEY, *supra*, at 264 ("to order or rule; to correct, scourge, or whip"); 1 WEBSTER, *supra*, at 579 ("To correct; to chastise; to punish").

explained above, the original public meaning of "governing" in the military context was the power to command troops and enforce laws against them, which included the ability to punish the troops and otherwise impose consequences for failure to obey the relevant rules of discipline. *See supra* notes 10–12 and accompanying text. That's why the Supreme Court has said that "the rules of *discipline*" are those "by which the militia is to be *governed*." *Moore*, 18 U.S. (5 Wheat.) at 14 (emphasis added); *accord Orloff v. Willoughby*, 345 U.S. 83, 94 (1953) ("The military constitutes a specialized community *governed* by a separate *discipline* from that of the civilian." (emphasis added)). Therefore, while Congress can always "provide for . . . disciplining" the militia, it's only when the militia is federalized that Congress can also "govern[]" them by punishing those who fail to conform to their prescribed discipline. U.S. CONST. art. I, § 8, cl. 16 (only providing for "governing" the militia "employed in the Service of the United States").

This understanding of "discipline" tracks how the word was typically used in the military context at the Founding. The above-mentioned dictionaries, for example, primarily equate military discipline with teaching and instructing.[15] As did the Founders and others during the Founding era.[16]

---

[15] *See* 1 WEBSTER, *supra*, at 579 ("military *discipline*, which includes instruction in manual exercise, evolutions and subordination"); *ibid.* ("To instruct and govern; to teach rules and practice, and accustom to order and subordination; as, to *discipline* troops or an army."); 2 WEBSTER, *supra*, at 126 (defining "militia" as "The body of soldiers in a state enrolled for discipline . . ."); 1 JOHNSON, *supra*, at 602 ("Military regulation."); DYCHE & PARDON, *supra*, at 229 ("the order or management observed in an army").

[16] Especially after the Revolutionary War, many Founders were worried about poorly trained soldiers, whom they described as "undisciplined." *See, e.g.*, George Washington, General Orders (Apr. 4, 1780) ("Commanding officers of Corps are immediately to put their new and undisciplined men in training."); Letter from George Washington to Samuel Washington (Aug. 31, 1780) ("We are always without an Army— or have a raw and undisciplined one, engaged for so short a time that we are not fit either for the purposes of offence or defence, much less is it in our power to project schemes &

No. 22-40399

execute plans which depend upon well disciplined and permanent Troops."); Letter from John Adams to Colonel Hitchcock (Oct. 1, 1776) ("There is a Way, of introducing Discipline into the most irregular Army . . . . The first is . . . train[ing] your Regiments and Brigades to the manual Exercises and the Manoeuvres."); Letter from Brigadier General George Weedon to George Washington (Dec. 1, 1777) ("Troops undisciplined [and] worn-out by service, deprived of every comfort which is necessary to restore health & vigor, cannot be supposed to support an attack against those who thro' the Winter have been in comfortable quarters, constantly trained in Manœvreing & other exercises."); 3 Elliot's Debates, *supra*, at 51 (Patrick Henry, Virginia) ("Will your mace-bearer be a match for a disciplined regiment?"); The Federalist No. 29, at 143 (Alexander Hamilton) (George W. Carey & James McClellan eds., 2001) ("[I]t will be possible to have an excellent body of well trained militia, ready to take the field whenever the defence of the state shall require it. This will not only lessen the call for military establishments; but if circumstances should at any time oblige the government to form an army of any magnitude, that army can never be formidable to the liberties of the people, while there is a large body of citizens, little, if at all, inferior to them in discipline and the use of arms, who stand ready to defend their own rights, and those of their fellow citizens."); Letter from Gouverneur Morris to Moss Kent (Jan. 12, 1815) ("But to rely on undisciplined, ill-officered men, though each were individually as brave as Caesar, to resist the well-directed impulse of veterans, is to act in defiance of reason and experience."); Letter from W.H. Sumner to John Adams (May 3, 1823) ("[F]or what purpose did the convention maintain the right in congress, to prescribe [the militia's] discipline? This right could be of no use, if the militia be not trained accordingly. . . . The value of our militia, as an example should be estimated by the superiority of its discipline. If what was said of the Massachusetts militia during the war, by one, who had seen that of the other states, was true, 'that its spirit and drill was as much superior to that of most other parts of the country, as the value of its specie currency was above their unredeemed bills,' our pride, as well as interest should be engaged in supporting its elevated standard.").

The Founders also sought to ensure that the militia be trained according to a uniform discipline so they could act in concert when federalized. *See, e.g.*, Pinckney, *supra*, at 207 ("[A] uniformity in Discipline and Regulations should pervade the whole, otherwise, when the Militia of several States are required to act together, it will be difficult to combine their operations from the confusion a difference of Discipline and Military Habits will produce."); The Federalist No. 29, at 140 (Alexander Hamilton) ("It requires no skill in the science of war to discern, that uniformity in the organization and discipline of the militia, would be attended with the most beneficial effects, whenever they were called into service for the public defence. It would enable them to discharge the duties of the camp and of the field with mutual intelligence and concert . . . an advantage of peculiar moment in the operations of an army; and it would fit them much sooner to acquire the degree of proficiency in military functions, which would be essential to their usefulness."); 2 Elliot's Debates, *supra*, at 521 (James Wilson, Pennsylvania) ("[M]en without a

24

No. 22-40399

So too did Congress. For example, Congress in 1792 passed "An Act more effectually to provide for the National Defence by establishing an Uniform Militia throughout the United States." 1 Stat. 271. In § 7 of that Act, Congress adopted "Baron von Steuben's 'Rules of Discipline,' which had originally been adopted by [the Continental] Congress in 1779." Wiener, *supra*, at 214 n.188 (citing 13 Journals of the Continental Congress 384–85).[17] Von Steuben's disciplinary rules were a "150-plus-page manual regulat[ing] all manner of military operations," from "the proper positioning of soldiers within a company and a regiment on the battlefield" to detailed "instructions for loading and firing rifles." Saikrishna Bangalore Prakash, *The Separation and Overlap of War and Military Powers*, 87 Tex. L. Rev. 299, 332 (2008); *see also* Joseph R. Riling, Baron von Steuben and His Regulations (1966) (including a complete facsimile of von Steuben's Regulations). Here again, as elsewhere, the Founding generation understood militia "discipline" as the instructions and standards the United States wanted the militia to learn in state training so they would be uniformly prepared when "call[ed] forth." U.S. Const. art. I, § 8, cl. 15.

b.

Where does President Biden's military vaccine mandate fit into the Organizing Clause's text? Everyone acknowledges that the Government can

---

uniformity of arms, accoutrements, and discipline, are no more than a mob in a camp; that, in the field, instead of assisting, they interfere with one another.").

[17] *See* § 7, 1 Stat. at 273 ("*And be it further enacted*, That the rules of discipline, approved and established by Congress in their resolution of the twenty-ninth of March, [1779], shall be the rules of the discipline to be observed by the militia . . . . It shall be the duty of the commanding officer at every muster, whether by battalion, regiment, or single company, to cause the militia to be exercised and trained agreeably to the said rules of discipline.").

set readiness requirements for non-federalized Guardsmen by dint of the "disciplining" power.[18] And Governor Abbott stipulates that the erstwhile vaccine mandate was one such readiness requirement.

The parties differ, however, on how to classify most of the enforcement measures. Recall that the Government has threatened five consequences against those who refused to get COVID injections while the mandate was in effect and who never sought an accommodation: (1) courts-martial; (2) discharge from the Guard; (3) prohibiting Guardsmen from participating in drills, training, and other duties; (4) withholding pay from individual Guardsmen; and (5) withholding funds from individual States. Governor Abbott stipulates that the fifth measure is constitutional. But he argues that the first four are impermissible "governing" of the non-federalized militia, and that the third measure additionally impedes upon the States' "training" authority.

We agree with the Governor. As explained above, the "governing" power encompasses the authority to punish the militia and otherwise enforce the relevant laws against them. *See supra* Part III.B.1.a.iii. On this understanding, both court-martialing and firing noncompliant Guardsmen are punishments. So are preventing those Guardsmen from training and withholding their pay. Accordingly, the Government's enforcement orders unlawfully usurp Governor Abbott's exclusive constitutional authority to "govern" the non-federalized Texas militia.

---

[18] As the Government points out, "The Department of Defense and the military services have long required service members, including members of the National Guard, to meet stringent medical and physical fitness standards so that they remain ready to defend the nation." These standards include height and weight requirements, fitness tests, and a range of immunizations.

No. 22-40399

2.

Founding-era history supports this understanding of the Organizing Clause. *See Gamble v. United States*, 139 S. Ct. 1960 (2019) (beginning with text before turning to history); *Bruen*, 142 S. Ct. 2111 (same). We (a) begin with the background concerns that informed the Organizing and Calling Forth Clauses. Then we (b) discuss the Founders' constitutional compromise, which gave the United States significant war powers but deprived the new national government the power to punish non-federalized militiamen.

a.

The Revolutionary War exposed many defects in the Articles of Confederation—chief among them its decentralized military structure. The Articles gave the federal government power to declare war and "make requisition from each state for its quota [of militiamen]." Articles of Confederation of 1781 art. IX, para. 5; *see also id.* art. VI, para. 5.; *id.* art. IX para. 1; The Federalist No. 22, at 105 (Alexander Hamilton) (George W. Carey & James McClellan eds., 2001) ("The power of raising armies [in the Articles] . . . is merely a power of making requisitions upon the states for quotas of men."). And the States, in turn, were required to "always keep up a well regulated and disciplined militia, sufficiently armed and accoutred." Articles of Confederation of 1781 art. VI, para. 4. "The problem of course was that the Articles of Confederation stopped midstream. Congress was empowered to wage war but was dependent on the cooperation of the [S]tates to do so." Jason Mazzone, *The Security Constitution*, 53 UCLA L. Rev. 29, 76 (2005). That's because there was "no mechanism to force the [S]tates to comply." *Ibid.*

This system proved costly and cumbersome. For one, it produced a collective action problem: "The States near the seat of war, influenced by

27

No. 22-40399

motives of self-preservation, made efforts to furnish their quotas, which even exceeded their abilities; while those at a distance from danger were, for the most part, as remiss as the others were diligent, in their exertions." FEDERALIST NO. 22, at 106 (Alexander Hamilton). This led to "scanty levies of men" in "the most critical emergencies." *Ibid.* Relatedly, because there was little to no national coordination of the militia's preparation, the Revolutionary War exposed a concomitant "lack of uniformity in [the militia's] organization, equipment and training." Francis X. Conway, *A State's Power of Defense Under the Constitution*, 11 FORDHAM L. REV. 169, 174 (1942).[19] As early as September of 1776, George Washington expressed his frustrations about the militia to John Hancock: "To place any dependance upon Militia, is, assuredly, resting upon a broken staff." Letter from George Washington to John Hancock (Sept. 25, 1776). Although Washington's statement proved hyperbolic—the militia had its share of triumphs during the Revolution[20]—the sentiment rang true: the new Constitution needed to give the United States greater power to provide for national security.

---

[19] At the Constitutional Convention, for example, Charles Pinckney "mentioned a case during the war in which a dissimilarity in the militia of different States had produced the most serious mischiefs." *Records of the Federal Convention*, *supra*, at 205. Others including George Mason, James Madison, and Alexander Hamilton expressed similar sentiments about military uniformity and discipline. *See id.* at 205–06; THE FEDERALIST NO. 29, at 140 (Alexander Hamilton) ("This desirable uniformity can only be accomplished, by confiding the regulation of the militia to the direction of the national authority."); *see also supra* note 16.

[20] *See* Daus, *supra*, at 501 ("During the war, the militia won a mixed record, and those frustrated with the institution contemplated its reform, not its abolition. For each humiliating rout[] like the one at Guilford Courthouse came a modest triumph against the Cherokee, loyalist militias, or British Regulars in guerilla campaigns. A remark by Lord Cornwallis captured the record's ambivalence: 'I will not say much in praise of the militia . . . but the list of British officers and soldiers killed and wounded by them . . . proves but too fatally they are not wholly contemptible.'").

No. 22-40399

On the other hand, "[a]mong the ratifying generation, support for a [stronger] national military coexisted with widespread fears of a standing army." Mazzone, *supra*, at 65; *see also United States v. Miller*, 307 U.S. 174, 179 (1939) ("The sentiment of the time strongly disfavored standing armies; the common view was that adequate defense of country and laws could be secured through the Militia-civilians primarily, soldiers on occasion."); *District of Columbia v. Heller*, 554 U.S. 570, 597–99 (2008). Informed in no small part by their experiences with British troops on American soil, *see* DECLARATION OF INDEPENDENCE paras. 13, 14, 16 (U.S. 1776), the Founding generation worried that professional soldiers would imperil the promises of a free government, *see* AKHIL R. AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 53–56 (1998). That's because professional soldiers—unlike the citizen-populated militia—were "removed from the freedoms enjoyed by the republican political community that they were defending." Robert Leider, *Federalism and the Military Power of the United States*, 73 VAND. L. REV. 989, 996 (2020); *see also* 1 WILLIAM BLACKSTONE, COMMENTARIES *414–17. The Founding generation thought this weakened the soldiers' ties to the rest of society and rendered them vulnerable to manipulation by tyrants. Thus, as Samuel Adams wrote:

> A standing Army . . . is always dangerous to the Liberties of the People. Soldiers are apt to consider themselves as a Body distinct from the rest of the Citizens. They have their Arms always in their hands. Their Rules and their Discipline is severe. They soon become attachd to their officers and disposd to yield implicit Obedience to their Commands. Such a Power should be watchd with a jealous Eye. . . . Men who have been long subject to military Laws and inured to military Customs and Habits, may lose the Spirit and Feeling of Citizens. . . . [But] [t]he Militia is composd of free Citizens. There is therefore no Danger of their making use of their Power to the

destruction of their own Rights, or suffering others to invade them.

Letter from Samuel Adams to James Warren (Jan. 7, 1776). Federalists and Anti-Federalists alike expressed the same concerns.[21] As did generations of their forefathers "[t]hroughout English history." Conway, *supra*, at 174.

The Federalists and Anti-Federalists also agreed on this: They "prized and cherished" the militia as "the palladium of liberty." *Ibid.* Inspired by the storied militia system of Mother England, every colony (save for Pennsylvania) organized a militia as early as the seventeenth century. *See* Mazzone, *supra*, at 70–71 ("Every able-bodied, white male was required to arm himself, enroll in the local unit, participate in training exercises, and go to fight when called."). The Founders continued to believe that such a large group of armed and trained men intensely loyal to their States and localities would "enable the people to resist and triumph over" sudden "foreign

---

[21] *See, e.g.*, 3 ELLIOT'S DEBATES, *supra*, at 381 (James Madison, Virginia) ("[A] standing army is one of the greatest mischiefs that can possibly happen."); *id.* at 401 (Edmund Randolph, Virginia) ("With respect to a standing army, I believe there was not a member in the federal Convention, who did not feel indignation at such an institution."); *Emerson*, 270 F.3d at 238–39 & nn.44–45 (collecting statements from various Anti-Federalists expressing "fear[] that the federal government's standing army could be used to tyrannize and oppress the American people"); 3 ELLIOT'S DEBATES, *supra*, at 379 (George Mason, Virginia) ("There are various ways of destroying the militia. A standing army may be perpetually established in their stead. I abominate and detest the idea of a government, where there is a standing army."); John DeWitt, *To the Free Citizens of the Commonwealth of Massachusetts* (1787), *reprinted in* 4 THE COMPLETE ANTI-FEDERALIST 34, 37–38 (Herbert J. Storing ed., 1981) ("[S]tanding armies are a solecism in any government . . . . [N]o nation ever supported them, that did not resort to, rely on, and finally become a prey to them. . . . They are brought up to obedience and unconditional submission.—With arms in their hands, they are taught to feel the weight of rigid discipline:—They are excluded from the enjoyments which liberty gives to its votaries, they, in consequence, hate and envy the rest of the community in which they are placed, and indulge a malignant pleasure in destroying those privileges to which they never can be admitted.").

invasions, domestic insurrections, and domestic usurpations of power by rulers." 3 STORY, *supra*, § 1890; *accord* Noah Webster, *An Examination into the Leading Principles of the Federal Constitution*, *reprinted in* PAMPHLETS ON THE CONSTITUTION OF THE UNITED STATES, PUBLISHED DURING ITS DISCUSSIONS BY THE PEOPLE, 1787-1788, at 25, 43 (Paul L. Ford ed., 1888) ("The supreme power in America cannot enforce unjust laws by the sword; because the whole body of the people are armed, and constitute a force superior to any band of regular troops that can be, on any pretence, raised in the United States.").

But the militia was more than just a check against tyranny. The Founding generation also considered it an essential civic institution and a source of pride. Where the contemporary military is national, hierarchical, and professional, the early-American militia was local, democratic, and unapologetically amateur. In the minds of the Founding generation, the militia thus sparked notions of civic duty, self-reliance, and republican virtue. *See* Daus, *supra*, at 493–504; John C. Yoo, *The Continuation of Politics by Other Means: The Original Understanding of War Powers*, 84 CAL. L. REV. 167, 227 (1996). Accordingly, many Founders trusted and lauded the militia for the very same reasons they despised standing armies. *See* Leider, *supra*, at 996–

No. 22-40399

98. Even those most comfortable with standing armies and professional soldiers (like Hamilton and Washington[22]) paid their respects to the militia.[23]

The Constitution thus must be understood in this tripartite historical context. (1) The Founding generation understood the need for a strong national defense. (2) Yet the Founders loathed and feared standing armies. The bridge between those two propositions? (3) They cherished and trusted the militia, which was first and foremost a *state* prerogative—unless and until federalized by the general government.

---

[22] *See, e.g.*, THE FEDERALIST NO. 25, at 125 (Alexander Hamilton) ("The steady operations of war against a regular and disciplined army, can only be successfully conducted by a force of the same kind. . . . War, like most other things, is a science to be acquired and perfected by diligence, by perseverance, by time, and by practice."); 20 WRITINGS OF GEORGE WASHINGTON 49–50 (John C. Fitzpatrick ed., 1937) ("Regular Troops alone are equal to the exigencies of modern war, as well for defence as offence, and whenever a substitute is attempted it must prove illusory and ruinous. *No Militia* will ever acquire the habits necessary to resist a regular force. . . . The firmness requisite for the real business of fighting is only to be attained by a constant course of discipline and service.").

[23] *See, e.g.*, THE FEDERALIST NO. 25, at 125 (Alexander Hamilton) ("The American militia, in the course of the late war, have, by their valor on numerous occasions, erected eternal monuments to their fame."); THE FEDERALIST NO. 29, at 143 (Alexander Hamilton) ("[I]f circumstances should at any time oblige the government to form an army of any magnitude, that army can never be formidable to the liberties of the people, while there is a large body of citizens, little, if at all, inferior to them in discipline and the use of arms, who stand ready to defend their own rights and those of their fellow-citizens. This appears to me the only substitute that can be devised for a standing army; and the best possible security against it, if it should exist."); George Washington, Sentiments on a Peace Establishment (May 1, 1783) ("Were it not totally unnecessary and superfluous to adduce arguments to prove what is conceded on all hands the Policy and expediency of resting the protection of the Country on a respectable and well established Militia, we might not only shew the propriety of the measure from our peculiar local situation, but we might have recourse to the Histories of Greece and Rome in their most virtuous and Patrioic ages to demonstrate the Utility of such Establishments.").

No. 22-40399

b.

The Constitution reflects all three propositions. To ensure the United States can adequately defend itself, the Constitution assigns Congress the power to "raise and support" an Army and Navy. U.S. CONST. art. I, § 8, cl. 12. But to force Congress to "periodically debat[e] whether to continue funding a standing army," Leider, *supra*, at 1000, that power is subject to the limitation that "no Appropriation of Money to that Use shall be for a longer Term than two Years," U.S. CONST. art. I, § 8, cl. 12.

The Constitution also preserves the militia as another check on the standing Army. But unlike the Articles of Confederation, the Constitution more substantially bifurcates authority over the militia between the state and federal governments. Primary control resides with the States, but the United States can use and control the militia in certain circumstances. To dampen the need for a standing army, Congress can provide for "calling forth" the militia into federal service and for "governing" such part of them in federal service. *Id.* cls. 15–16. The "calling forth" power, however, is in turn limited to three purposes: "execut[ing] the Laws of the Union, suppress[ing] insurrections[,] and repel[ling] invasions." *Id.* cl. 15.

What about the lack of training and uniformity that plagued the militia during the Revolution? The Constitution addresses this by authorizing Congress to provide uniform standards for the organizing, arming, and disciplining of the militia. *Id.* cl. 16. But to keep the militia tethered to its state and local roots and to insulate it from national capture, the States retained the right to conduct the militia's training, appoint officers, and govern the non-federalized militia. *Ibid.*[24] Such state control—alongside other

---

[24] *See, e.g.*, 3 STORY, *supra*, § 1202 ("The appointment of the officers of the militia was exclusively in the states; and how could it be presumed, that such men would ever consent to the destruction of the rights or privileges of their fellow-citizens. The power to

33

No. 22-40399

constitutional assurances like the Second Amendment, *see Heller*, 554 U.S. at 599—was intended to make the militia a potent counterweight to any abuses of national military power.[25]

Here, as in so many areas of constitutional interpretation, the Federalist–Anti-Federalist debates are illuminating. The Anti-Federalists worried that the federal government would arrogate to itself too much power

---

discipline and train the militia, except when in the actual service of the United States, was also exclusively vested in the states; and under such circumstances, it was secure against any serious abuses."); THE FEDERALIST NO. 29, at 143 (Alexander Hamilton) ("What shadow of danger can there be from men, who are daily mingling with the rest of their countrymen; and who participate with them in the same feelings, sentiments, habits and interests? What reasonable cause of apprehension can be inferred from a power in the union to prescribe regulations for the militia, and to command its services when necessary; while the particular states are to have the *sole and exclusive appointment of the officers*? If it were possible seriously to indulge a jealousy of the militia, upon any conceivable establishment under the federal government, the circumstance of the officers being in the appointment of the states, ought at once to extinguish it. There can be no doubt, that this circumstance will always secure to them a preponderating influence over the militia."); A Native of Virginia, *Observations Upon the Proposed Plan of Federal Government* (1788), *reprinted in* 1 THE WRITINGS OF JAMES MONROE, 349, 371–72 (Stanislaus Murray Hamilton ed., 1898) ("How can the command of Congress over the militia be either absolute or unqualified, when its officers are appointed by the States, and consequently can by no possibility become its creatures? They will generally be men of property and probity: And can any one for a moment suppose that such men will ever be so lost to a sense of liberty, the rights of their country, and their own dignity, as to become the instruments of arbitrary measures? Whenever that shall be the case, we may in vain contend for forms of government; the spirit of liberty will have taken its flight from America, and nothing but an arbitrary government will be fit for such a people, however accurately defined the powers of her Constitution may be.").

[25] "In fact two of the strongest champions of a regular army, Hamilton and Madison, went so far as to make persuasive pleas in *The Federalist* for the grant of power to Congress to raise a standing army on the premise that the militia of the several states would be adequate protection against any encroachment by the Federal Government through its use of a regular army." Conway, *supra*, at 174–75; *see also* THE FEDERALIST NO. 29 (Alexander Hamilton); THE FEDERALIST NO. 46 (James Madison).

over the States' militias. The Federalists insisted that would never happen and that non-federalized militias would remain the States' domain.

Let's start with the Anti-Federalists' concerns. At the constitutional convention, for example, the great Anti-Federalist Elbridge Gerry exclaimed that if too much control over the militia was taken away from the States, the Constitution would "have as black a mark as was set on Cain." *Records of the Federal Convention*, *supra*, at 206; *see also* Luther Martin's Letter on the Federal Convention of 1787, *reprinted in* 1 ELLIOT'S DEBATES, *supra*, at 344, 372 ("[If too much] power over the militia should be taken away from the [S]tates, and also given to the general government, it ought to be considered as the last *coup de grace* to the State governments."). The Anti-Federalists also worried that if the United States was given too much control over the militia, it would attempt to subvert the institution by, *inter alia*, "making militia service so unpleasant that the people would demand a standing army." *United States v. Emerson*, 270 F.3d 203, 238 (2001); *see also id.* at 237–39. And the Anti-Federalists feared that the United States might fine, court-martial, and otherwise punish non-federalized militiamen as a way "to cow the militia, destroy it, or convert it into a tool of oppression." Daus, *supra*, at 509.[26]

---

[26] *See, e.g.*, 3 ELLIOT'S DEBATES, *supra*, at 400 (Virginia Ratifying Convention) ("[I]t is feared that the militia are to be subjected to martial law when not in service."); *id.* at 402 (George Mason, Virginia) ("[A]fter having read the clause which gives Congress power to provide for arming, organizing, and disciplining the militia, and governing those in actual service of the Union, [Mason] declared it as his firm belief, that it included the power of annexing punishments . . . . If so, he asked if Congress could not inflict the most ignominious punishments on the most worthy citizens of the community. . . . It might be thought a strained construction, but it was no more than Congress might put upon it. He thought such severities might be exercised on the militia as would make them wish the use of the militia to be utterly abolished, and assent to the establishment of a standing army."); *The Address and Reasons of Dissent of the Minority of the Convention of Pennsylvania to their Constituents* (Dec. 18, 1787), *reprinted in* 3 THE COMPLETE ANTI-FEDERALIST, *supra*,

No. 22-40399

In response, the Federalists assured the Anti-Federalists time and again that the Organizing Clause would only authorize punishment *after* the militia had been "called forth"—and the "governing" power had been unlocked. At the Virginia Ratifying Convention, for example, Anti-Federalist George Mason worried that the Organizing Clause countenanced "the power of annexing punishments" against the militia. 3 ELLIOT'S DEBATES, *supra*, at 402 (he did, however, admit this was a "strained construction" of that Clause). Henry Lee then quickly and forcefully retorted that Mason was "mistaken." *Id.* at 407. Lee proclaimed: "Suffice it to say, [the Organizing Clause] does not include the infliction of punishments. The militia will be subject to the common regulations of war when in actual service; but not in time of peace." *Ibid.* A chorus of other Federalists made similar arguments.[27]

---

at 145, 164 ("The absolute unqualified command that Congress have over the militia may be made instrumental to the destruction of all liberty . . . . As militia they may be subjected to fines to any amount, levied in a military manner; they may be subjected to corporal punishments of the most disgraceful and humiliating kind, and to death itself, by the sentence of a court martial."); Letter from George Mason to Thomas Jefferson (May 26, 1788) ("There are many other things very objectionable in the proposed new Constitution; particularly the almost unlimited Authority over the Militia of the several States; whereby, under Colour of regulating they may disarm, or render useless the Militia, the more easily to govern by a standing Army; or they may harrass the Militia, by such rigid Regulations and intollerable Burdens, as to make the People themselves desire it's Abolition."); Luther Martin, *Letter in the Baltimore Maryland Journal* (Mar. 18, 1788), *reprinted in* ESSAYS ON THE CONSTITUTION OF THE UNITED STATES, PUBLISHED DURING ITS DISCUSSION BY THE PEOPLE, 1787–1788, at 353, 359 (Paul L. Ford ed., 1892) ("Nor is the suggestion unreasonable . . . that the government might improperly oppress and harass the militia, the better to reconcile them to the idea of regular troops, who might relieve them from the burthen, and to render them less opposed to the measures it might be disposed to adopt for the purpose of reducing them to that state of insignificancy and uselessness.").

[27] *See, e.g.*, 3 ELLIOT'S DEBATES, *supra*, at 401 (Edmund Randolph, Virginia) ("But it is feared that the militia are to be subjected to martial law when not in service. They are only to be called out in three cases, and only to be governed by the authority of Congress when in the actual service of the United States; so that their articles of war can no longer operate upon them than when in the actual service of the Union."); *id.* at 391

No. 22-40399

Even James Madison—who was in favor of national control over the militia to the greatest extent possible—conceded that the United States could only so govern the militia when it was "called forth" (*i.e.*, federalized). *Id.* at 424. "This federalism check proved a winning point for the framers, and they hammered it again and again and again." Daus, *supra*, at 510.

---

(Wilson Nicholas, Virginia) ("But his great uneasiness is, that the militia may be under martial law when not on duty. A little attention will be sufficient to remove this apprehension. The Congress is to have power 'to provide for the arming, organizing, and disciplining the militia, and for governing such part of them as may be employed in the service of the United States.' Another part tells you that they are to provide for calling them forth, to execute the laws of the Union, suppress insurrections, and repel invasions. These powers only amount to this—that they can only call them forth in these three cases, and that they can only govern such part of them as may be in the actual service of the United States. This causes a sufficient security that they will not be under martial law but when in actual service."); *id.* at 645 (Zachariah Johnson, Virginia) ("Having a numerous offspring, I am careful to prevent the establishment of any regulation that might entail oppression on them. When gentlemen of high abilities in this house, and whom I respect, tell us that the militia may be subjected to martial law in time of peace, and whensoever Congress may please, I am much astonished. My judgment is astray, and exceedingly undiscerning, if it can bear such a construction. Congress has only the power of arming and disciplining them. The states have the appointment of the officers, and the authority of training the militia, according to the discipline prescribed by Congress. When called into the actual service of the United States, they shall be subject to the marching orders of the United States. Then, and then only, it ought to be so. When we advert to the plain and obvious meaning of the words, without twisting and torturing their natural signification, we must be satisfied that this objection is groundless."); *see also* 3 STORY, *supra*, § 1202 ("It is difficult fully to comprehend the influence of [the Anti-Federalist's] objections, urged with much apparent sincerity and earnestness at such an eventful period. The answers then given seem to have been in their structure and reasoning satisfactory and conclusive. . . . [Namely,] [t]he right of governing [the militia] was confined to the single case of their being in the actual service of the United States, in some of the cases pointed out in the constitution. It was then, and then only, that they could be subjected by the general government to martial law. . . . The idea of congress inflicting severe and ignominious punishments upon the militia in times of peace was [considered by the Federalists] absurd.").

Soon after the Constitution was ratified, Congress provided punishments for those in the Army and the federalized militia *only*.[28] (Tellingly, many of those punishments mirror those the Government has here threatened against Texas's Guardsmen—including courts martial, discharge, and withholding pay.) Although Congress in 1792 "did pass a statute that purported to establish 'an Uniform Militia throughout the United States,' . . . [it] was virtually ignored for more than a century." *Perpich*, 496 U.S. at 341; *see supra* Part III.B.1.a.iv (discussing Congress's adoption of Baron von Steuben's "Rules of Discipline"). And the Government hasn't cited a single example of the United States punishing such delinquency during those hundred-odd years.

In fact, the *only* time the Founding-era Congress provided *any* punishments for non-federalized militiamen was when they refused the President's call to serve. *See* Act of May 2, 1792, ch. 28, 1 Stat. 264 (listing punishments for failure to obey the President's call); U.S. CONST. art I,

---

[28] *See* Act of February 28, 1795, ch. 36, §§ 4–5, 1 Stat. 424, 424 ("[T]he militia *employed in the service of the United States*, shall be subject to the same rules and articles of war, as the troops of the United States . . . . *And be it further enacted*, That every officer, non-commissioned officer, or private of the militia, who shall fail to obey the orders of the President of the United States, in any of the cases before recited, shall forfeit a sum not exceeding one year's pay, and not less than one month's pay, to be determined and adjudged by a court martial; and such officer shall, moreover, be liable to be cashiered [*i.e.*, discharged] by sentence of a court martial, and be incapacitated from holding a commission in the militia, for a term not exceeding twelve months, at the discretion of the said court: And such non-commissioned officers and privates shall be liable to be imprisoned by a like sentence, on failure of payment of the fines adjudged against them, for one calendar month, for every five dollars of such fine." (first emphasis added)); An Act Establishing Rules and Articles for the Government of the Armies of the United States, ch. 20, 2 Stat. 359 (1806); *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 35 (1827) ("The rules and articles of war, by the very terms of the statute of 1806, are those 'by which the *armies* of the United States shall be governed;' and the act of 1795 . . . provide[s], 'that the militia *employed* in the service of the United States . . . shall be subject to the same rules and articles of war as the troops of the United States.'").

§ 8, cl. 15; *id.* art. II, § 2, cl. 1; *see also Moore*, 18 U.S. (5 Wheat.) 1. But as the Revolutionary War demonstrated, the young Nation's defense depended equally upon the militia's discipline and its willingness to serve when called by the President. *See supra* Part III.B.2.a; *see also supra* note 16. Yet the ratifying generation only punished the latter. Why? *Because the Constitution only gave them authority to do the latter.*[29]

Thus, the Constitution's text, history, and tradition instruct that States retain exclusive authority to punish militiamen—unless and until called into national service. If and when the militia is called into federal service, the President can punish either the refusal to heed his call or the refusal to meet his standards. But that power exists *only* when the militia is called into national service. That's why President Biden is "Commander in Chief . . . of the Militia of the several States" only "*when called into the actual Service of the United States.*" U.S. CONST. art II, § 2 (emphasis added). And it's also why Governor Abbott remains "Commander-in-Chief of the military forces of the State" at all other times. TEX. CONST. art IV, § 7; *see Holdiness*, 808 F.2d at 421 ("[T]he Governor remains in charge of the National Guard in each state except when the Guard is called into active federal service.").

---

[29] *See Moore*, 18 U.S. (5 Wheat.) at 18 ("[T]he refusal or neglect of the militia to obey the orders of the President, is declared to be an offence against the United States, and subjects the offender to a certain prescribed punishment. But this flows from the power bestowed upon the general government to call them forth."); 3 STORY, *supra*, § 1208 ("Congress may, by suitable laws, provide for the calling forth of the militia, and annex suitable penalties to disobedience of their orders, and direct the manner, in which the delinquents may be tried. But the authority to call forth, and the authority exclusively to govern, are quite distinct in their nature.").

No. 22-40399

\* \* \*

The Constitution forbids President Biden from treating the non-federalized militia just like the Army. One of the Constitution's most foundational compromises reserved substantial authority over the militia to the States. As demonstrated at length above, the plain meaning of the Organizing Clause as well as pre-ratification and post-ratification history all point in the same direction: Governor Abbott retains exclusive power to punish his non-federalized Guardsmen and otherwise govern them. Governor Abbott is thus likely to succeed on his claim that the Government's challenged enforcement measures are unconstitutional.

## C.

Against the Constitution's text, history, and tradition, President Biden offers four counterarguments. None is persuasive.

### 1.

The Government claims that the Founding-era history discussed above isn't relevant because the modern National Guard didn't exist at the Founding. True, but irrelevant. "The National Guard *is* the modern Militia reserved to the States by Art. I, § 8, cl. 15, 16 of the Constitution." *Maryland*, 381 U.S. at 46 (emphasis added). And everyone agrees that the modern militia, to the same degree as the militia of the late 1700s, is subject to Article I, Section 8, Clause 16 of the United States Constitution. That Clause couldn't be clearer: when Congress exercises its "organizing" power (as it did when it created the modern National Guard), it doesn't also unlock some new "governing" power. U.S. CONST. art. I, § 8, cl. 16; *see Moore*, 18 U.S. (5 Wheat.) at 48 (Story, J.) ("[W]e are not at liberty to add one jot of power to the national government beyond what the people have granted by the constitution.").

40

Moreover, the above history *does* shed light on this dispute. The Founders created a vertical separation of powers over the militia precisely to prevent the federal government from treating the militia just like the Army. *See supra* Part III.B.2. Today—just as in 1789—the Organizing Clause ensures that the militia remains under state governance unless and until it is properly federalized. And it's hard to imagine a more obvious exercise of the "governing" power than punishing someone for disobedience.

### 2.

The Government next contends that its threatened enforcement measures are not "punishments," but instead are mere "consequences" emanating from its "disciplining" power. That's so, it says, because "disciplining" "naturally includes the ability to impose consequences for non-compliance with the rules prescribed." Red Br. 31. Or as the Government put it elsewhere, "[a] necessary corollary to the ability to set readiness standards is the ability to enforce readiness standards." *Id.* at 23.

That reasoning is flawed for a host of reasons. We'll highlight three.

First, as a textual matter, the Government's capacious understanding of the "disciplining" power contravenes the original public meaning of "discipline"—the skills and standards the United States wanted the militia to learn in state training. *See supra* Part III.B.1.a.iv. It also robs the "governing" power of its original meaning by rendering it largely superfluous. *See supra* Part III.B.1.a.iii. Worse yet, this reading rips the otherwise cohesive constitutional fabric by giving the term "govern" radically distinct meanings just two sentences apart. *Ibid. Compare* U.S. CONST. art. I, § 8, cl. 14, *with id.* cl. 16. *See also* Akhil R. Amar, *Intratextualism*, 112 HARV. L. REV. 747 (1999).

Second, and crucially, the Government obviously does not consider the COVID vaccine mandate a "readiness standard" *because the Government*

*repealed the mandate.* Indeed, the Government hasn't threatened any "consequences" against (A) unvaccinated Guardsmen hired after the mandate's repeal. But the Government *has* threatened to impose "consequences" against (B) those Guardsmen who didn't get injections while the mandate was in effect. How could the mandate constitute a "readiness requirement" if Guardsmen A can freely ignore it, but Guardsmen B can't? Thus—contrary to the Government's frequent pre-repeal statements—the mandate has nothing to do with "ensur[ing] that National Guard members are ready to integrate into U.S. military operations and to serve the nation on short notice" because members of that military now have diametrically different vaccination statuses. Nor are the enforcement measures mere "consequences" in furtherance of military readiness. Instead, they're punishments for disobedience—pure and simple. *See* Leo Shane III, *Troops Who Refused COVID Vaccines Still Could Face Punishment*, Military Times (Feb. 28, 2023), https://www.militar ytimes.com/news/coronavirus/2023/02/28/troops-who-refused-covid-vaccines-still-could-face-punishment/ ("[T]hose who refused [vaccination] in the past could still be booted for 'disobeying a lawful order' . . . . 'It's very important that our service members follow orders when they are lawful, and there are thousands that did not,' Gilbert Cisneros Jr., Under Secretary of Defense for Personnel, told members of the House Armed Services Committee."). The only thing that differentiates Guardsmen A and Guardsmen B is obedience—not readiness.

Finally, as a structural matter, even if the power to "provide for . . . disciplining" the militia included the ability to punish disobedience, the Constitution commands that the States alone can mete out that discipline to non-federalized Guardsmen. And States do that, of course, by (1) "training the Militia according to the discipline prescribed by Congress" and (2) otherwise "governing" them. U.S. Const. art. I, § 8, cl. 16; *see also*

No. 22-40399

*supra* Parts III.B.1.a.iii–iv. So call them "punishments" or call them "consequences," the Constitution is clear that only the States can enforce the discipline Congress enacts. If President Biden wants to do it himself, he must first federalize the Texas Guard. But if President Biden is unwilling or unable to do so, he cannot punish Guardsmen B *as if* he'd federalized the Guard. If the Constitution makes anything clear, it's that federalization matters.

To all this, the Government defends its capacious reading of "discipline" by arguing that "governing" would still have *some* meaning under its interpretation: "When the federal government is 'governing' the militia, the National Guard is under the exclusive control of the federal government in ways that the non-federalized National Guard is not." Red Br. 33. But even if the Government's interpretation gives "governing" *some* meaning, it's still unconstitutional if it doesn't give "governing" the *right* meaning. Regardless, if the Government could simply bypass the States' Governors and enforce any requirement it liked directly against the States' Guardsmen, it's unclear what new power the Government unlocks once it federalizes the Guard. U.S. CONST. art. I, § 8, cl. 16 (granting Congress the power "[t]o provide for . . . governing such Part of [the militia] as may be employed in the Service of the United States"). Nor is it clear why the Founders took such care to separate "governing" from "disciplining" in this context and reserve the former to the States by default. *Cf.* U.S. CONST. art. I, § 8, cl. 14 (assigning the governing power with no mention of "disciplining"); *see also supra* Part III.B.2. "This strange treatment of the constitutional text cannot be justified." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1894 (2021) (Alito, J., concurring); *see also Wright v. United States*, 302 U.S. 583, 588 (1938) ("To disregard such a deliberate choice of words and their natural meaning would be a departure from the first principle of

constitutional interpretation"—that "every word must have its due force, and appropriate meaning." (quotation omitted)).

### 3.

The Government alternatively frames its threatened punishments as "merely the enforcement of conditions on the receipt of federal funds." The district court did too: "looking past labels, the consequences at issue are only an inability to receive federal pay, benefits, and recognition for militia service not compliant with federal regulations." But it is an elementary proposition of constitutional law that "conditions attached to Spending Clause legislation are valid only if they are . . . not in violation of an independent constitutional provision." *Miller v. Tex. Tech Univ. Health Scis. Ctr.*, 421 F.3d 342, 348 n.15 (5th Cir. 2005) (en banc) (citing *South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987)). Here, the Organizing Clause imposes an independent constitutional bar against governing the non-federalized militia. If the Government is unwilling or unable to federalize the noncompliant Guardsmen, the most the Government could do is withhold money from the *State's* Guard. *See* 32 U.S.C. § 108. Governor Abbott could then either make up that funding from the State's fisc; or he could decide where the consequences of that financial cut would fall.

The Government protests that Congress gave it the statutory authority to do more than simply withhold funding from the States. Specifically, the Government points to 32 U.S.C. §§ 322–24 to justify its authority to withdraw Guardsmen's federal recognition and discharge them; to §§ 501–02 for its authority to prohibit Guardsmen from participating in drills, training, and other duties; and to § 108 for its authority to withhold pay from individual Guardsmen. It's unclear that the Government has the best reading of these statutes. But in any event, this mode of reasoning is deficient for the same reason as the last: Regardless of whether the Government's

No. 22-40399

reading of these *statutes* is correct, the *Constitution* forbids President Biden from bypassing the States, stepping into Governor Abbott's shoes, and directly governing Texas's non-federalized militiamen.

4.

Finally, the court below based its decision in large part on its understanding that the Government has not threatened to court martial any non-federalized Guardsmen. As the district court explained, "the vaccination requirement at issue is enforced only through a denial of federal pay, federal benefits, and federal recognition that enables those federal pay and benefits." That was error. In its opposition to Governor Abbott's preliminary injunction motion, the Government attached a declaration of Colonel Mulcahy, who summarized the "various means for the federal government to ensure that state National Guards comply with federal military regulations when they are performing federally authorized training and missions in a Title 32 status." Among other things, Colonel Mulcahy listed "courts-martial of National Guard service members who are not in Federal service" and cited the statutory authority for courts-martial, 32 U.S.C. §§ 326–27. Relying on this declaration, the Government said in no uncertain terms that "failure to comply with federal regulations can lead to individual adverse actions, including formal written reprimands up to court martial." If this is not a threat, it's unclear what else it could be.

As a backup argument, the Government qualifies Colonel Mulcahy's declaration by explaining that "[a]lthough Congress [in 32 U.S.C. §§ 326–27] has provided the means for court-martial of non-federalized National Guard members, any consequences imposed under those statutory provisions would be imposed by the state through its own court-martial regime and as provided by state law." Thus, the Government says, there's "no risk" that the non-federalized Guardsmen "would be punished by the

federal government." That's also incorrect. Sections 326 and 327 make clear that while the ultimate punishment would be "as provided by the laws of the respective States," 32 U.S.C. § 326, the federal government would be the one convening the courts-martial imposing the punishments, *see id.* § 327(b) ("In the National Guard not in Federal service . . . general courts-martial may be convened by the President."). The Mulcahy declaration reaffirms this reading by listing courts-martial as one of the "means for the *federal government* to ensure that state National Guards comply with federal military regulations."

## IV.

In addition to likelihood of success on the merits, Governor Abbott must also demonstrate "that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. Because the district court only considered the likelihood-of-success prong, we remand so the district court can consider the other three in the first instance. *E.g.*, *Sambrano v. United Airlines, Inc.*, 2022 WL 486610 (5th Cir. 2022) (per curiam) (remanding for consideration of the not-yet-evaluated preliminary injunction factors).

We do, however, note that the situation is materially different now than it was when the district court first considered Governor Abbott's preliminary injunction motion. That's because the Government repealed the vaccine mandate whilst still threatening punishment for past disobedience. That obviously changes the nature of all three remaining preliminary-injunction factors.

\*　　　\*　　　\*

The Government conceded that its erstwhile vaccine mandate is unnecessary to military readiness by repealing it. The question, therefore, is

whether the President can *punish* non-federalized Guardsmen in Texas who refused to get COVID injections before the President and Congress deemed such injections unnecessary. For the reasons given above, we hold that the Constitution's text, history, and tradition foreclose the President's efforts to impose such punishments.

We VACATE the district court's order denying Governor Abbott's motion for a preliminary injunction and REMAND for further proceedings consistent with this opinion.